IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DEBRA BLOOMER, Individually, and as Mother and Guardian of JONATHAN BLOOMER, a minor,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC,<br>A Tennessee Limited Liability Company,<br><br>    Defendant. | Case No. 8:05CV503 |

### BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO COMPEL RETURN OF INADVERTENTLY PRODUCED DOCUMENT

Defendant Bridgestone Firestone North American Tire, LLC, successor to Bridgestone/Firestone, Inc. ("Firestone"), submits the following Brief in support of its Motion to Compel Return of Inadvertently Produced Document.

### I. INTRODUCTION

Nebraska law provides a qualified privilege for a company's trade secret information. Courts across the country have recognized that a tire company's proprietary formulas for its rubber compounds constitute trade secrets, and Firestone takes the same view with respect to its rubber compound formulas. These formulas represent years of research and development, and their disclosure to competitors would cause Firestone irreparable harm in the marketplace. For these reasons, Firestone goes to great lengths to protect this information from unwarranted or inadvertent disclosure, both in its normal business practices, and in the context of litigation. Despite these precautions, a document containing formula information was inadvertently

included within the hundreds of thousands of pages of documents in the Steeltex document collection that was produced to plaintiffs in response to discovery in this matter.[1]

When this inadvertent production was brought to Firestone's attention at a deposition in another case, Firestone promptly requested return of the document in this case. Plaintiffs' counsel has refused to return the document. Therefore, Firestone seeks an order from the Court requiring the immediate return of the inadvertently produced document containing its trade secret formula information.

## II.   BACKGROUND

### A.   Firestone's Steeltex Document Collection.

In response to plaintiffs' discovery requests in this matter, Firestone has produced a large volume of information through the contents of its Steeltex document collection.[2] On September 29, 2000, the National Highway Traffic Safety Administration ("NHTSA") initiated a Preliminary Evaluation, designated PE00-040, of certain Firestone Steeltex R4S, R4S II, and Radial A/T steel belted radial tires pursuant to 49 U.S.C. § 30101, et. seq. That investigation was closed on April 9, 2002, with NHTSA finding no "specific design or manufacturing defect" in those Steeltex tires. As part of the investigation, Firestone provided NHTSA with a variety of data and information related to the Steeltex Radial A/T, R4S and R4S II tire lines. In addition, Firestone collected centrally available and reasonably accessible documents related to the design, development, testing, manufacture, warranty practices, adjustments, and lawsuits and claims involving tread separations for Firestone Steeltex Radial A/T, R4S and R4S II tires. Firestone combined a copy of those documents with its initial response to NHTSA's request, and any

---

[1] The Steeltex collection consists of over 162,000 pages of paper documents in text image file format (TIFF) images, and several times that volume of documents in electronic format.

[2] Plaintiffs' counsel William Frates previously obtained the Steeltex collection in other litigation, and Firestone agreed to his use of that collection in this case.

supplemental submissions, organized as they were kept in the usual course of business, into a single collection. Given the proprietary and commercially sensitive nature of many of the documents included in the Steeltex document collection, Firestone produced the collection subject to the Protective Order in this matter.

The document collection effort that resulted in the Steeltex collection was conducted by outside counsel at the request of Firestone in anticipation of litigation. *See* Affidavit of Christopher J. Wesser, attached as Exhibit A, ¶ 5. The collection efforts covered a period of many months, and involved the efforts of nearly two dozen attorneys and paralegals collecting and reviewing the paper records and electronically stored information from multiple departments and locations within the company. *Id.* The scope of the document collection included all tires bearing the "Steeltex" trade name, regardless of size, date or place of manufacture, and included both paper and electronically stored information related to the design, manufacture, testing and performance of Steeltex tires. *Id.* at ¶ 7. Outside counsel reviewed hundreds of boxes of paper documents and thousands of electronic files, totaling hundreds of thousands of pages, for relevance and responsiveness, as well as for attorney-client and trade secret privileges. *Id.* Privileged documents were segregated from the collection and listed on a privilege log. *Id.* Firestone ultimately produced over 375 boxes of paper records and 5 CDs of electronic files related to Steeltex tires. *Id.*

Despite the best efforts of Firestone's counsel and paralegals, a single page of paper containing trade secret formula information was included among the hundreds of thousands of pages contained in the Steeltex document collection. *Id.* at ¶ 8. Specifically, Firestone produced within the collection a document entitled, "Interim Design Review," dated August 5, 2003, Bates Nos. SHA-F0045902 – SHA-F0045956, one page of which includes proprietary and trade secret

3

formula information for different belt skim stocks used or considered for use by Firestone. This production was unintentional. *Id.*

When this document was identified at a deposition in another case involving a Steeltex tire, Firestone's counsel took prompt action to secure the return of this document in that litigation and in other cases where it had been produced, including the instant case. By multiple telephone calls to plaintiffs' counsel Timothy O'Brien and two letters dated December 10, 2007, and December 21, 2007, Firestone's counsel requested return of the inadvertently produced document in exchange for a redacted version of the document. *See* Letters from D. Chesire to T. O'Brien and W. Frates, attached as Exhibit B. Plaintiffs' counsel has refused to return the document.

**B.    Firestone's Trade Secret Information.**

The inadvertently produced document contains formula information for different steel belt skim stock formulas used or considered for use by Firestone. The steel belt skim stock refers to a specifically formulated rubber compound calendered onto the steel cord to form the steel belts in a steel belted radial passenger or light truck tire. *See* Affidavit of Brian J. Queiser, attached as Exhibit C, ¶ 8. It is formulated to provide, among other things, adhesion between the rubber and steel cord, and between the belts and surrounding components. *Id.* A rubber compound formula typically contains the chemicals or ingredients used in the compound; the quantities, or relative percentages of those ingredients; and the manner in which those ingredients are processed to form the compound and give it the desired physical properties after it is vulcanized, or cured. *Id.* at ¶ 9. The information at issue reveals the specific ingredients and their quantities in different steel belt skim stock formulas.

This information is a highly proprietary trade secret of enormous commercial value. *Id.* at ¶ 10. The steel belt skim stock formula represents one of Firestone's most valuable assets and most closely guarded secrets. *Id.* The formula is the product of years of intensive and costly development activity at Firestone, representing thousands of man hours and millions of dollars of research and testing. *Id.* at ¶ 9. In order to preserve that value and competitive advantage, it is essential that the secrecy of all aspects of this formula be maintained, including the list of specific ingredients and their quantities that go into the formula. *Id.* Therefore, Firestone seeks the return of the document containing this trade secret formula information which was inadvertently included in the Steeltex document collection produced in this case.

### III.   ARGUMENT

#### A.   The Formula Information Constitutes a Trade Secret.

Pursuant to Fed. R. Evid. 501, questions of privilege in federal courts "shall be determined in accordance with state law." Under Nebraska law, trade secrets enjoy a qualified privilege. Neb. Rev. Stat. § 27-508 provides that:

> A person has a privilege, ... to refuse to disclose and to prevent other persons from disclosing a trade secret owned by him, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice.

By any definition, the formula information at issue constitutes trade secret information. The Trade Secrets Act, Neb. Rev. Stat. §§ 87-501 – 87-507, for example, defines a "trade secret" as any information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code or process that:

> (a) derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

5

> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Neb. Rev. Stat. § 87-502(4); see also *Magistro v. J. Lou, Inc.,* 270 Neb. 438, 442, 703 N.W.2d 887, 890 (2005). The Restatement (First) of Torts, § 757, cmt b (1939), suggests six factors to consider when deciding trade secret status:

- The extent to which the information is generally known to competitors;
- The extent to which the information is known within the company;
- The measures taken to safeguard the information;
- The value of the information;
- The resources expended in developing the information; and
- The effort required to duplicate the information.

*See also Northwestern Bell Tel. Co. v. American Data Sys.,* 223 Neb. 415, 421, 390 N.W.2d 495, 500 (1986). (applying Restatement factors in trade secret analysis).

As evidenced by the Affidavit of Brian Queiser, the formula information at issue satisfies these requirements. These belt skim stock "recipes" were developed through an extensive and costly research and development program. Queiser Aff. at ¶ 9. Other members of the tire industry also jealously guard their compound formulas, so that information is not known to competitors. *Id.* at ¶ 12. Within Firestone, access to the formulas is limited on a "need-to-know" basis. *Id.* at ¶ 11. In addition, the compounds are identified on the tire specification only by code, and, even at the manufacturing facilities, the information identifying the formula is also coded so that specific chemicals are not identified. *Id.* Thus, Firestone goes to great lengths to protect the secrecy of its compound formulas.

Moreover, this formula information is not readily ascertainable. Given the physical and chemical changes that occur in the compounds when the tire is cured, it is not possible to reverse

6

engineer the compound to determine its original recipe. *Id.* at ¶ 18. To duplicate the rubber compound, one must have the list of its ingredients, the percentages of those ingredients, and production information—i.e., the formula, or recipe. *Id.*

In light of the enormous value of its proprietary formulas, Firestone would suffer irreparable harm from disclosure of the specific ingredients and their quantities in the different steel belt skim stock formulas at issue. *Id.* at ¶ 16. Tire companies are constantly looking to find a competitive advantage, and any cost savings in research and development, like having access to a competitor's compound formulas, can provide that advantage. *Id.* at ¶ 13. For example, with the list of ingredients and their amounts, a competitor could start its own compound development from a much further advanced stage, or eliminate—or at least shortcut—certain steps in the development and evaluation of its own compounds. *Id.* at ¶ 15. This is more than an ephemeral risk in today's market with the rise in tires imported from foreign countries. *See, e.g.,* Bruce Davis, "Foreign Tire Makes Continue Gains in U.S.," Tire Business, May 10, 2004, pp. 9, 25, attached as Exhibit D. Thus, access to Firestone's belt skim stock formula information would provide a competitor with a substantial boost at Firestone's disadvantage. Queiser Aff., ¶ 16. Finally, Firestone continues to use one of the compounds at issue in the document in the production of its tires today. *Id.* at ¶ 21.

The trade secret status of tire companies' compound formulas has been upheld by numerous trial and appellate courts. Just last month, the Indiana Supreme Court affirmed that Firestone's proprietary skim stock formula constitutes a trade secret. *Bridgestone Americas Holding, Inc. v. Violet Mayberry,* No. 48S02-0703-CV-120, Order dated December 18, 2007, attached as Exhibit E. Applying a definition of "trade secret" similar to that recognized under Nebraska law, the court in *Bridgestone/Firestone, Inc. v. Superior Court of the County of*

*Alameda*, 9 Cal. Rptr. 2d 709, 711 (Cal. App. 1992), determined that the compound formula at issue constituted a trade secret. Opinion attached as Exhibit F. Other jurisdictions applying the Uniform Trade Secret Act, similar to Nebraska's Trade Secrets Act, have reached the same conclusion. Likewise, those jurisdictions that rely on different authority, such as the Restatement or a state statute, to define a trade secret have found a tire company's proprietary compound formulas to be trade secret. *See, e.g., Crum v. Bridgestone/Firestone North American Tire, LLC*, 907 A.2d 578 (Pa. Super. 2006), opinion attached as Exhibit G; *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730 (Tex. 2003), opinion attached as Exhibit H; *In re Continental General Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998), opinion attached as Exhibit I. Therefore, in accordance with the decisions of other courts facing this same issue, the Court should find that the formula information at issue is a privileged trade secret.

**B.     Production Should Not Constitute a Waiver of the Privilege.**

Although Nebraska courts do not appear to have addressed the question of whether inadvertent production of trade secret information constitutes a waiver of the privilege, other courts have developed a standard for determining whether there has been a waiver of privilege as it applies to attorney-client communication and attorney work product. In determining whether there has been a waiver of the work product or attorney client privilege, courts in the Eighth Circuit will look to the totality of the circumstances surrounding the inadvertent production. *See, e.g., Gray v. Bicknell*, 86 F.3d 1472, 1483-84 (8th Cir. 1996); *Starway v. Independent Sch. Dist. No. 625*, 187 F.R.D. 595, 596-97 (D. Minn. 1999).

Under this approach, known as the "middle of the road" or *Hydraflow* approach, courts typically weigh five factors to determine whether the production amounts to a waiver of the privilege:

> (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error.

*Gray*, 86 F.3d at 1483-84. As the Eighth Circuit noted, this five-step analysis "strikes the appropriate balance between protecting attorney-client privilege and allowing, in certain situations, the unintended release of privileged documents to waive the privilege." *Id.* at 1484. Thus, courts have recognized that errors can "inevitably occur in modern, document-intensive litigation" and, in certain cases where the producing party can demonstrate that they took reasonable precautions against disclosure, the unintended release of privileged documents should not waive that privilege. *Id.*

Such is the case here where Firestone has produced hundreds of thousands of pages of documents in discovery. As the Affidavit of Christopher J. Wesser makes clear, Firestone's counsel took reasonable precautions to prevent the production of trade secret information. Firestone's counsel carefully reviewed each document in hundreds of boxes of paper documents and thousands of electronic files that were mainly technical in nature related to the design, manufacture, testing and performance of Steeltex tires. *Id.* at ¶ 7. Privileged documents were segregated from the collection and listed on a privilege log. *Id.* Despite the many precautions taken during the collection and review process to identify and withhold all trade secret or privileged information, a single page of paper containing trade secret formula information was included among the tens of thousands of pages contained in the Steeltex document collection. *Id.* at ¶ 8. This production was unintentional.

Although the document was originally produced as part of the Steeltex document collection three years ago, Firestone was not aware of its inclusion in the hundreds of thousands

9

of pages in the collection until it was brought to Firestone's attention at a recent deposition in another matter. Moreover, although the Steeltex document collection has been produced in approximately two dozen cases, in each case it has been produced pursuant to a protective order to limit dissemination of the confidential and proprietary information within the collection. Firestone is currently taking steps to seek the return of the inadvertently produced document in those cases where the Steeltex document collection is still in the possession of the plaintiff's counsel, including this case. Firestone will provide plaintiffs' counsel in those cases, as well as in this case, with a copy of the "design review" document with the formula information redacted from the document. In other words, the majority of the information in the document will be available to plaintiffs in this case. Finally, given the commercial value of this information and the competitive harm Firestone is likely to suffer if the information was disclosed to a competitor, the interests of justice mandate its return to Firestone.

Given these considerations, the Court should find that the circumstances weigh in favor of prohibiting continued possession and use of the inadvertently produced privileged document. Therefore, the Court should compel return of that document to Firestone.

## IV. CONCLUSION

Based on the foregoing, Firestone respectfully requests that the Court grant Firestone's motion and compel plaintiffs to return the inadvertently produced document, including all copies and electronic versions.

Respectfully submitted,

BRIDGESTONE FIRESTONE NORTH
AMERICAN TIRE, LLC
Defendant,

By: _____
Daniel P. Chesire, #15029
LAMSON, DUGAN & MURRAY, LLP
10306 Regency Parkway Drive
Omaha, NE 68114
Telephone: (402) 397-7300

and

Scott G. Edwards, TX Bar #06461480
Hartline, Dacus, Barger, Dryer & Kern, LLP
6688 North Central Expressway, Suite 1000
Dallas, TX 75206

and

Marc R. Brosseau, Esq., CO Bar #7415
KERR BROSSEAU BARTLETT O'BRIEN, LLC
1600 Broadway, Suite 1600
Denver, CO 80202

11